Gregory L. Diskant (admitted *pro hac vice*)
Eugene M. Gelernter (admitted *pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
Facsimile:  (212) 336-2222
E-mail:        gldiskant@pbwt.com
                 emgelernter@pbwt.com

Richard Goetz (S.B. #115666)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:    (213) 430-6000
Facsimile:     (213) 430-6407
E-Mail:        rgoetz@omm.com

Sue Roeder (S.B. #160897)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA  94025
Telephone:    (650) 473-2600
Facsimile:     (650) 473-2601
E-Mail:        sroeder@omm.com

Attorneys for Plaintiffs LIFESCAN, INC.
and LIFESCAN SCOTLAND, LTD.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| LIFESCAN, INC. and LIFESCAN SCOTLAND, LTD., | **Case No. V11-04494-EJD** |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | **(FED. R. CIV. P. 65)** |
| SHASTA TECHNOLOGIES, LLC, DECISION DIAGNOSTICS CORP., PHARMATECH SOLUTIONS, INC., and CONDUCTIVE TECHNOLOGIES, INC., | Date:        March 15, 2013 Time:        9 a.m. Place:        5th Floor, Courtroom 4 Judge:       Hon. Edward J. Davila |
| Defendants. | |

1

**NOTICE OF MOTION**

2        PLEASE TAKE NOTICE that Plaintiffs LifeScan, Inc. and LifeScan Scotland, Ltd.

3 (collectively, "LifeScan") hereby move under Fed. R. Civ. P. 65 for a preliminary injunction barring

4 Defendants from contributing to and inducing the infringement of LifeScan's U.S. Patent No.

5 7,250,105, *e.g.*, selling or offering to sell Defendants' Shasta GenStrip product in the United States.

6        This motion is based on this Notice; the Memorandum of Points and Authorities; the

7 accompanying Declarations of Dr. Mark Meyerhoff, Peter Menziuso and Eugene M. Gelernter; all

8 pleadings and papers on file in this matter; any oral argument before the Court; and any other

9 matters the Court may request or consider.

10

11    Dated: December 14, 2012            ___/s/ Eugene M. Gelernter_____
                                          Gregory L. Diskant (admitted *pro hac vice*)
12                                        Eugene M. Gelernter (admitted *pro hac vice*)
                                          PATTERSON BELKNAP WEBB & TYLER LLP
13                                        1133 Avenue of the Americas
                                          New York, NY 10036
14                                        Telephone:    (212) 336-2000
                                          Facsimile:    (212) 336-2222
15                                        E-mail:       gldiskant@pbwt.com
                                                        emgelernter@pbwt.com
16
                                          Richard Goetz (S.B. #115666)
17                                        O'MELVENY & MYERS LLP
                                          400 South Hope Street
18                                        Los Angeles, CA  90071-2899
                                          Telephone:    (213) 430-6000
19                                        Facsimile:    (213) 430-6407
                                          E-Mail:       rgoetz@omm.com
20
                                          Sue Roeder (S.B. #160897)
21                                        O'MELVENY & MYERS LLP
                                          2765 Sand Hill Road
22                                        Menlo Park, CA  94025
                                          Telephone:    (650) 473-2600
23                                        Facsimile:    (650) 473-2601
                                          E-Mail:       sroeder@omm.com
24
                                          Attorneys for Plaintiffs LIFESCAN, INC.
25                                        and LIFESCAN SCOTLAND, LTD.

26

27

28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................1

FACTUAL BACKGROUND ..................................................................................................3

    A.    LifeScan's OneTouch Ultra System ...........................................................3

    B.    The Shasta GenStrip ...................................................................................5

    C.    The Impact on LifeScan Absent an Injunction .........................................5

    D.    Use of the Shasta GenStrip Would Infringe the '105 Patent ....................6

ARGUMENT ..........................................................................................................................7

THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION ..................................7

    A.    LifeScan Has a Strong Likelihood of Success on the Merits.....................7

        1.    Likelihood of Success for the '105 Patent:  Infringement.................8

            a.    Use of the GenStrip Would Directly Infringe the '105 Patent ..............8

            b.    Defendants' Contributory Infringement Under § 271(c).....................10

            c.    Sales of OneTouch Ultra Meters Do Not Exhaust LifeScan's Rights Under the '105 Patent ........................................................11

            d.    Purchasers of LifeScan's Meters Do Not Have An Implied License to Practice the '105 Patent With the Shasta GenStrip............14

        2.    Likelihood of Success for the '105 Patent:  Validity/Enforceability ..............16

    B.    Sales of the GenStrip Would Irreparably Harm LifeScan ...........................16

        1.    Sales of the GenStrip Would Decimate LifeScan's Business ..........................17

        2.    Loss of Market Share .......................................................................................18

        3.    Questions About Defendants' Ability to Pay a Damage Award .....................18

        4.    Price Erosion ....................................................................................................19

        5.    Injury to LifeScan's Goodwill.........................................................................19

        6.    Loss of Revenues for R&D Efforts..................................................................19

        7.    Injury to Reputation ........................................................................................20

-i-

8.      Loss of the Right to Exclude.................................................................................20

9.      Injury from False Advertising and Promotion ...................................................21

C.      The Balance of the Equities Favors a Preliminary Injunction .....................................21

D.      The Public Interest Favors a Preliminary Injunction ...................................................22

CONCLUSION...........................................................................................................................24

-ii-

# TABLE OF AUTHORITIES

Page

CASES

*Abbott Labs. v. Andrx Pharms., Inc.,*
   473 F.3d 1196 (Fed. Cir. 2007)......................................................................7

*Abbott Labs. v. Sandoz, Inc.,*
   544 F.3d 1341 (Fed. Cir. 2008)...........................................................8, 16, 23

*Ajilon Prof'l Staffing, LLC v. Griffin,*
   No. CV-09-561, 2009 U.S. Dist. LEXIS 49328 (D. Ariz., May 29, 2009) .............17

*Alloc, Inc. v. Int'l Trade Comm'n,*
   342 F.3d 1361 (Fed. Cir. 2003)....................................................................10

*Amgen Inc,. v. F. Hoffmann-LaRoche Ltd.,*
   No. 05-12237, 2008 WL 4452454 at*48 (D. Mass. Oct. 2, 2008) ....................22, 23

*Arizona Cartridge Remanufacturers Ass'n. v. Lexmark Int'l,*
   421 F.3d 981 (9th Cir. 2005) ......................................................................15

*Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,*
   750 F.2d 903 (Fed. Cir. 1984)......................................................................14

*Bio-Technology Gen. Corp. v. Genentech, Inc.,*
   80 F.3d 1553 (Fed. Cir. 1996).......................................................................19

*Black & Decker, Inc. v. Robert Bosch Tool Corp.,*
   2006 WL 3446144 (N.D. Ill. Nov. 29, 2006) .......................................................20

*Buffalo Wings Factory, Inc. v. Mohd,*
   1:07-CV-612 JCC 2008, U.S. Dist. LEXIS 86360 (E.D. Va. Oct. 23, 2008)...........18

*Carborundum Co. v. Molten Metal Equip. Innovations,*
   72 F.3d 872 (Fed. Cir. 1995).........................................................................14

*Celsis in Vitro, Inc. v. Cellzdirect, Inc.,*
   664 F.3d 922 (Fed. Cir. 2012).........................................................16, 19, 20, 23

*Fujitsu Ltd. v. NetGear, Inc.,*
   620 F.3d 1321 (Fed. Cir. 2010).....................................................................10

*Golden Blount, Inc. v. Robert H. Peterson Co.,*
   438 F.3d 1354 (Fed. Cir. 2006).....................................................................11

-iii-

*High Tech. Medical Instrumentation, Inc. v. New Image Indus., Inc.*,
   49 F.3d 1551 (Fed. Cir. 1995)..................................................................................7

*Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*,
   302 F.3d 1352 (Fed. Cir. 2002)..............................................................................7

*Kewanee Oil Co. v. Bicron Corp.*,
   416 U.S. 470 (1974)...............................................................................................22

*LifeScan, Inc. v. Can-Am Care Corp.*,
   859 F. Supp. 392 (N.D. Cal. 1994) ........................................................................15

*LifeScan Inc. v. Polymer Tech. Int'l Corp.*,
   No. C94-672R, 1995 U.S. Dist. LEXIS 4916 (W.D. Wash. Jan. 3. 1995) .............15

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
   520 F. Supp. 2d 537 (D. Del. 2007)........................................................................20

*McData Corp. v. Brocade Communications Sys., Inc.*,
   233 F. Supp. 2d 1315 (D. Colo. 2002)....................................................................7

*Met-Coil Systems Corp. v. Korners Unlimited, Inc.*,
   803 F.2d 684 (Fed. Cir. 1986)...........................................................................14, 16

*Novozymes A/S v. Genencor Int'l, Inc.*,
   474 F. Supp. 2d 592 (D. Del. 2007)...................................................................21, 22

*Payless Shoesource, Inc. v. Reebok Int'l Ltd.*,
   998 F.2d 985 (Fed. Cir. 1993)................................................................................24

*Pfizer, Inc. v. Teva Pharm., USA, Inc.*,
   429 F.3d 1369 (Fed. Cir. 2005)..............................................................................24

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
   429 F.3d 1364 (Fed. Cir. 2005)..............................................................................8

*Purdue Pharma L.P. v. Boehringer Ingelheim Gmbh*,
   237 F.3d 1359 (Fed. Cir. 2001).........................................................................7, 18

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
   553 U.S. 617 (2008).....................................................................................11, 12, 13

*Reebok Int'l, Ltd. v. J. Baker, Inc.*,
   32 F.3d 1552 (Fed. Cir. 1994)................................................................................20

*Revision Military, Inc. v. Balboa Mfg. Co.*,
   No. 2011-1628 2012 U.S. App. LEXIS 24359 (Fed. Cir. Nov. 27, 2012) .............7

-iv-

*Richoh Co. v. Quanta Computer, Inc.*,
   550 F.3d 1325 (Fed. Cir. 2008)....................................................................11, 12, 13, 14

*Robert Bosch LLC v. Pylon Mfg. Co.*,
   659 F.3d 1142 (Fed. Cir. 2011)........................................................................ passim

*Sanofi-Synthelabo v. Apotex, Inc.*,
   470 F.3d 1368 (Fed. Cir. 2006)...................................................................19, 21, 22, 23

*Smith & Nephew, Inc. v. Synthes (U.S.A.)*,
   466 F. Supp. 2d 978 (W.D. Tenn. 2006).........................................................21, 23

*Smith Int'l, Inc. v. Hughes Tool Co.*,
   718 F.2d 1573 (Fed. Cir 1983).........................................................................24

*Spansion, Inc. v. Int'l Trade Comm'n*,
   629 F.3d 1331 (Fed. Cir. 2010).........................................................................11

*United States v. Univis Lens Co.*,
   316 U.S. 241 (1942)...................................................................................12, 13, 14

*Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*,
   559 F.2d 841 (D.C. Cir. 1977)...........................................................................17

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
   782 F.2d 995 (Fed. Cir. 1986)...........................................................................21

**STATUTES**

35 U.S.C. § 271............................................................................................1, 8, 11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 15(a) .........................................................................................2

Fed. R. Civ. P. 65 ..............................................................................................1

**PRELIMINARY STATEMENT**

Plaintiffs LifeScan, Inc. and LifeScan Scotland, Ltd. (collectively "LifeScan") respectfully move under Fed. R. Civ. P. 65 for a preliminary injunction barring Shasta Technologies, LLC, Decision Diagnostics Corp., Pharmatech Solutions, Inc. and Conductive Technologies, Inc. (collectively, "Defendants") from contributing to and inducing the infringement of LifeScan's U.S. Patent No. 7,250,105 by selling or offering to sell their GenStrip product in the United States in violation of 35 U.S.C. § 271 (b) and (c).

LifeScan's OneTouch® Ultra® glucose monitoring systems are the leader in the worldwide market for glucose monitoring systems.  LifeScan has built its business by distributing millions of OneTouch meters to diabetics for free or below cost.  LifeScan recovers its considerable investments in the business, pays its employees, sponsors ongoing research and development and earns a profit by the sale of disposable test strips for use in the meters.  Defendants intend to take advantage of LifeScan's gigantic investment by selling GenStrips for use in certain OneTouch meters at half the price.  The launch of the GenStrip – if not enjoined by this Court – will have a devastating effect on LifeScan's business.  Declaration of Peter Menziuso ("Menziuso Decl."), ¶¶ 3, 22-25.  In the next calendar year alone, Defendants project GenStrip sales of more than $170 million.  *Id*. at Ex. U.  The losses to LifeScan will likely be substantially greater.  Losses of this magnitude will lead to widespread layoffs, principally here in the Northern District of California where LifeScan is located, and threaten LifeScan's very viability as an ongoing concern.  *Id*. ¶ 51.

To protect its investment in its innovative technology, LifeScan has patented its strips and meters, separately and in combination.  This lawsuit was brought to enforce those rights.  For over a year, even before this litigation began, Defendants have responded to LifeScan's assertion of its patent rights by trying to conceal the structure of their product and the status of their FDA application.  As this Court has noted, Defendants refused repeated requests by LifeScan's counsel for samples of the GenStrip and relevant documents before this case was commenced.  *See* D.E. 108 at 11.  This stonewalling continued after LifeScan filed this case.  Instead of complying with Magistrate Judge Grewal's February 2012 Order directing Defendants to produce samples of the

GenStrip and the file of their communications with the FDA (D.E. 78 at 2-3), Defendants filed baseless objections, which this Court rejected in July 2012 as "fail[ing] to provide any basis" for challenging the Magistrate's Order (D.E. 107 at 4).  Defendants also violated a Stipulation & Order requiring production of documents describing their accused product (D.E. 94) – conduct that resulted in an award of sanctions (D.E. 130) that this Court upheld (D.E. 146).

When Defendants finally provided samples of the GenStrip and documents from the FDA file in August and September 2012, LifeScan learned for the first time that the GenStrip has structural features claimed in the '105 patent (in addition to features claimed by the LifeScan patents already in suit), and that the use of the GenStrip with LifeScan's OneTouch® Ultra® meters would infringe the '105 patent.  Declaration of Eugene M. Gelernter ("Gelernter Decl."), ¶ 8.  LifeScan then moved under Fed. R. Civ. P. 15(a) for leave to file a First Amended Complaint adding the '105 patent.  As part of their strategy of delay, Defendants Decision Diagnostics Corp. and Pharmatech Solutions, Inc. (collectively, "DDC") opposed that motion with no legitimate basis for doing so – and then abandoned their opposition when the motion was argued on December 5, 2012.  *Id.* ¶ 9.

Defendants' pattern of concealment continued.  At the December 5 hearing, DDC told the Court, in response to a question, that FDA clearance of the GenStrip was "imminent."  *Id.* ¶ 10.  This was false.  Although it was not yet public, the GenStrip had been cleared by the FDA the preceding week, on November 30, 2012.  Menziuso Decl., Ex. Q.  Knowing that FDA clearance would surely cause LifeScan to seek emergency relief from this Court, DDC apparently elected to conceal the clearance even from its own counsel.  *See* Gelernter Decl. ¶ 19.  Indeed, on December 5, the day of the hearing Defendants provided an updated production of their communications with the FDA that did *not* include the November 30 clearance letter.  As a result, LifeScan only learned of the FDA clearance letter by chance after the hearing, when its counsel saw the FDA clearance letter on Defendant DDC's website.  When we advised Defendants that we had seen the clearance letter on DDC's website, it appears DDC responded by blocking access to its website from computers at our offices.  *See id.* ¶¶ 11-17.

-2-

1         LifeScan has refrained from filing this motion until now because, until it was clear

2    that the GenStrip would in fact be approved, LifeScan was reluctant to impose on the Court to

3    consider a substantive motion that might prove unnecessary.  In the interim, LifeScan has carefully

4    analyzed the GenStrip product and its patent claims, with the goal of narrowing the issues for this

5    motion to those that are most readily capable of expedited resolution.  As a result, this motion

6    focuses on only one of the three patents-in-suit, one on which infringement is clear and validity

7    unchallenged.

8         With the FDA clearance on November 30, GenStrip's launch is now truly imminent.

9    In a conference call with investors on December 11, 2012, DDC representatives stated that they

10   intend to "hit the ground running [with sales of the GenStrip] January 1, 2013."  Gelernter Decl., Ex.

11   H at 11:2-4.  LifeScan now has no option to protect its patent rights – and to stay alive as a viable

12   business – other than to pursue this motion.  The discovery we have received establishes that the

13   intended use of the GenStrip with LifeScan's OneTouch Ultra meters would directly infringe

14   LifeScan's '105 patent and that Defendants would be contributing to and inducing that infringement.

15   The Court should grant a preliminary injunction to preserve the *status quo*.

16                                 **FACTUAL BACKGROUND**

17   **A.   LifeScan's OneTouch Ultra System**

18        LifeScan's patented glucose monitoring system has two principal components:

19   (1) meters, which LifeScan gives away or sells at less than their cost, and (2) disposable test strips,

20   which LifeScan sells at a profit.  *See* Menziuso Decl., ¶¶ 5, 12-13.  Persons with diabetes use the

21   system to monitor their blood glucose levels.  Regular testing helps detect hypoglycemia (low blood

22   glucose) or hyperglycemia (high blood glucose), which can lead to life-threatening complications if

23   left untreated.  It is one of the most important things that diabetics can do to ensure their health and

24   to prevent long-term complications.  This testing typically is done by the individual, at home, several

25   times each day.

26        LifeScan's OneTouch® Ultra® glucose monitoring systems are the leader in the

27   worldwide market for glucose monitoring systems.  To use the OneTouch system, a user places a

28

-3-

disposable test strip in the OneTouch Ultra meter.  The user then uses a lancet to draw a small drop of blood and places that drop on the strip.  The meter determines the blood glucose level in the sample by measuring the electrical current produced when an electrochemical reaction is triggered in the strip by the presence of glucose.  Using the OneTouch system, the diabetic may determine if his or her blood glucose level is within a satisfactory range or if some treatment is required to increase or decrease the blood glucose level.  *See id.* ¶ 5.

Several companies in the United States sell blood glucose monitoring systems, each with its own meters and strips.  Aside from the Shasta GenStrip, none of the other test strips on the market is capable of working with LifeScan's OneTouch Ultra meters.  *Id.* ¶ 7.

An important feature of the OneTouch Ultra system is that it takes two measurements for every blood sample, to protect against errors and to provide enhanced accuracy in blood glucose measurements.  LifeScan promotes this feature as its "DoubleSure™ Technology" on its packaging and in its promotional literature.  LifeScan's website tells customers that its "DoubleSure™ Technology automatically checks each blood sample twice," Menziuso Decl., Ex. A:



LifeScan's DoubleSure Technology – the subject of the '105 patent – is an important advantage of LifeScan's OneTouch Ultra system over competing systems.  *Id.* ¶ 10.

-4-

**B.      The Shasta GenStrip**

Ignoring the unprofitable market for LifeScan meters and foregoing the multi-million dollar annual expense associated with manufacturing and distributing meters, Defendants have targeted the LifeScan test strips, where LifeScan earns its profit.  Defendant DDC states on its website that the GenStrip is "comparable" to LifeScan's OneTouch Ultra test strips, but "priced significantly (50%) lower." *Id.* Ex. R; *see also id.* (The GenStrip



"will cost about 50% less than the Branded product ….").  The GenStrip is thus aimed directly at LifeScan's customers.  The GenStrip is cleared by the FDA only for use with LifeScan meters.  *Id.* Ex. 21.  Packaging for the GenStrip on Defendants' websites depicts the GenStrip being used with a LifeScan OneTouch UltraMini meter.  *Id.* Exs. S, T (emphasis added).   The Shasta GenStrip layout is almost a virtual copy of the LifeScan strip – including its patented DoubleSure Technology.

**C.      The Impact on LifeScan Absent an Injunction**

Introduction of the GenStrip would have a devastating impact on LifeScan.  The GenStrip is designed and cleared only for use in LifeScan's meters as a substitute for LifeScan's highly profitable OneTouch Ultra test strips.  Moreover, Defendants plan to sell the GenStrip at approximately one-half the price of LifeScan's OneTouch Ultra test strips.  As a result, the losses to LifeScan will dwarf the sales that GenStrip makes.  LifeScan's lost sales could run to hundreds of millions of dollars.  *See* pages 17-18, *infra*.  For comparison, LifeScan anticipates $1 billion total U.S. sales of the OneTouch® Ultra® test strip in 2012.  No business can sustain such losses.  The result will be widespread layoffs, cutbacks in research and development, reduction of educational efforts; and worse, GenStrip's launch will threaten LifeScan's ongoing viability as a business.  A win at trial after several years would be no solace.  LifeScan's business will have been irreparably depleted – or ended.  And LifeScan would not even recover its money damages, as Defendants do

-5-

1   not have the financial wherewithal to compensate LifeScan for its staggering losses after a trial on

2   the merits.  *See infra* at 18-19.

3            The harm to LifeScan from sale of the GenStrip would be severe and irreparable.

4   These harms could not be compensated in money damages.  *See* pages 16-21, *infra*.

5   **D.     Use of the Shasta GenStrip Would Infringe the '105 Patent**

6            A copy of LifeScan's '105 patent is attached to the First Amended Complaint (D.E.

7   170) as Exhibit C.  The '105 patent relates to the DoubleSure Technology, a method to improve the

8   reliability and accuracy of glucose measurements.  Test strips can give inaccurate results if the test

9   strips' sensors are not fully covered by blood. Ex. C to D.E. 170, at col. 1, lines 39-41.  Earlier

10  methods of dealing with this problem did not ensure that the sensors were completely covered by the

11  blood sample, resulting in variable and inaccurate results.  *Id.* at col. 1, lines 41-54.

12           The '105 patent addresses these problems through a innovative test strip design,

13  depicted in Fig. 2 of the patent, shown on the right.  A drop of blood is

14  applied to the top of the test strip in Fig. 2 and flows downstream by

15  capillary action.  *Id.* at 5:22-25.  The test strip has two working sensors (6b

16  and 8b in Fig. 2) that each generates electrical charge carriers proportional

17  to the amount of glucose in the blood.  One sensor (8b) is downstream of

18  the other (6b) with respect to blood flow.  This allows the current measured

19  at each sensor in response to the application of blood to be compared.  *Id.* at

20  2:10-27.



21           If the currents measured at each sensor are within a pre-

22  determined range of one another, the sensors are operating properly and

23  both sensors are covered by blood to the same degree.  *Id.* at 2:28-39.

24  Because blood flow is restricted so that it must entirely cover the first

25  sensor before covering the second sensor, this ensures that each electrode

26  has been covered completely.  *Id.* at 3:43-55.  If the difference between the current measured at each

27  sensor is greater than the pre-determined range, the test results will be unreliable (*e.g.*, because of

28                          -6-

insufficient blood, user error, manufacturing defect, or some other error) and the test done with that strip should be discarded.  Test strips using the design depicted in the '105 patent thus are self-testing for reliability – they are DoubleSure.  Claim 3 of the '105 patent describes this technology.

In designing the GenStrip for use with LifeScan's meters, Defendants could have used a different design.  *See* Declaration of Mark E. Meyerhoff ("Meyerhoff Decl.") at ¶¶ 43-48.  But they chose instead to use the specific design that the '105 patent claims.  Use of the GenStrip in conjunction with LifeScan's OneTouch Ultra meters would infringe claim 3 of the '105 patent, and Defendants would violate the patent statute by inducing and contributing to that infringement.

## ARGUMENT

## THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION

The standard for preliminary injunctive relief in patent cases is governed by Federal Circuit law.  *Revision Military, Inc. v. Balboa Mfg. Co.*, No. 2011-1628 2012 U.S. App. LEXIS 24359, *3 (Fed. Cir. Nov. 27, 2012).  The standard is well-settled:

> To obtain a preliminary injunction, a party must show
> (1) reasonable likelihood of success on the merits; (2) irreparable
> harm; (3) that the balance of hardships tips in its favor; and (4) the
> impact of the injunction on the public interest.

*Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002).  This standard is not "any more or less stringent than those applied to requests for preliminary injunctions in other areas of law."  *McData Corp. v. Brocade Communications Sys., Inc.*, 233 F. Supp. 2d 1315, 1319 (D. Colo. 2002) (citing *High Tech. Medical Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1554 (Fed. Cir. 1995)).

All four factors for preliminary injunctive relief are satisfied here.

## A.     LifeScan Has a Strong Likelihood of Success on the Merits

To demonstrate a "reasonable likelihood of success on the merits" a patentee must show that: (1) it will likely prove infringement; and (2) its infringement claim will likely withstand challenges to the patent's validity and enforceability.  *Purdue Pharma L.P. v. Boehringer Ingelheim Gmbh*, 237 F.3d 1359, 1363 (Fed. Cir. 2001).  This requires a clear showing that *at least one claim*

1    in one valid patent-at-issue is infringed.  *Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1213

2    (Fed. Cir. 2007).  An accused infringer cannot defeat a patentee's showing of likelihood of success

3    on the merits without raising a "substantial question" concerning infringement, validity, or

4    enforceability.  *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1364 (Fed. Cir. 2008).

5        **1.    Likelihood of Success for the '105 Patent:  Infringement**

6            Defendants are liable under Section 271(b) and (c) of the patent statute for

7    contributing to and inducing their customers' direct infringement.  This brief first discusses

8    customers' direct infringement and then discusses Defendants' indirect infringement.

9        **a.    Use of the GenStrip Would Directly Infringe the '105 Patent**

10           Generally, an infringement analysis requires two steps.  First, the court must construe

11   the asserted patent claims.  Second, the court must compare the properly construed claims to the

12   accused product or method to determine if the plaintiff is likely to meet its burden of proving

13   infringement by a preponderance of the evidence.  *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d

14   1364, 1372-23 (Fed. Cir. 2005).  Here, there are no terms that require construction, and there is

15   infringement under any reasonable claim construction.  Use of the GenStrip by Defendants'

16   customers with LifeScan's OneTouch Ultra meters would directly infringe claim 3 of the '105 patent.

17           Claim 3 of the '105 patent claims a method for measuring the concentration of

18   glucose in a sample liquid, *e.g.*, blood.  That method uses a "measuring device" comprising a test

19   strip with a particular arrangement of two working sensors and a reference sensor.  Each working

20   sensor generates electric charge carriers proportional to the glucose content of a sample.  The two

21   working sensors are arranged so that one sensor is downstream from the other, *i.e.*, the blood sample

22   comes in contact with the first sensor before reaching the second sensor.  The separate electrical

23   currents measured at each working sensor are compared by the meter to provide an error indication if

24   the difference between them exceeds a predetermined threshold.  This method of using the test strip

25   and meter in combination allows the user to confirm that enough blood was applied to cover both

26   working sensors, which yields a more accurate blood glucose reading.

27

28                                          -8-

1       In designing the GenStrip, Defendants did not need to use the test strip described in

2  claim 3 of the '105 patent.  *See* Meyerhoff Decl., ¶¶ 43-48.  But they chose to do so.  The GenStrip

3  uses the exact arrangement of two working sensors and a reference sensor that the '105 patent

4  claims.  Indeed, it is virtually a copy of Fig. 2 of the '105 patent.  Blood enters the top of the strip,

5  flows across the reference sensor (4b), which is upstream of the first working sensor (6b) and the

6  second working sensor (8b).  It then contacts the first working sensor and then the second working

7  sensor, which is downstream of the first working sensor:

8

9

10

11

12

13                                

14

15

16

17

18

19

20

21

22

23

24

25

26      When the GenStrip is inserted in a OneTouch Ultra meter, this arrangement of the

27  reference sensor and the two working sensors allows the system to compare the electric current from

28                                      -9-

each of the working sensors, to determine whether the strip is providing a reliable measurement of glucose in the sample.

In his declaration, Dr. Meyerhoff explains in detail how use of the GenStrip with LifeScan's OneTouch Ultra meters meets each limitation of claim 3 of the '105 patent, and directly infringes that claim.  *See* Meyerhoff Decl., ¶¶ 27-41, Ex. C.  Defendants have no substantial basis for disputing direct infringement.

### b.   Defendants' Contributory Infringement Under § 271(c)

Section 271(c) applies where a defendant sells or offers to sell in the United States a component or apparatus "that has no use except through practice of the patented method."  *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1361 (Fed. Cir. 2003).  Section 271(c) states:

> Whoever [1] offers to sell or sells within the United States or imports into the United States [2] a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, [3] knowing the same to be especially made or especially adapted for use in an infringement of such patent, and [4] not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

Defendants meet all of the requirements for contributory infringement under Section 271(c).

First, there is no question that Defendants intend to sell the GenStrip in the U.S.

Second, the GenStrip is an "apparatus for use in practicing a patented process" under § 271(c) because its only intended and approved use is with LifeScan's OneTouch meters.  As discussed above and in the Meyerhoff Declaration, using the GenStrip with those meters infringes claim 3, and the GenStrip is a "material part of the [claim 3] invention …."  *Id.*

Third, § 271(c)'s knowledge requirement is satisfied because Defendants have been on notice since June 24, 2011 of LifeScan's contention that the use of the GenStrip is likely to infringe the '105 patent.  D.E. 108 at 11 (citing D.E. 1 at ¶¶ 34-36).  Indeed, Defendants have had LifeScan's claim charts explaining in detail the basis for its infringement contentions since October 26, 2012.  *See* D.E. 152, Ex. B.  These facts are more than sufficient to demonstrate the "requisite knowledge" under § 271(c).  *Fujitsu Ltd. v. NetGear, Inc.*, 620 F.3d 1321, 1330 (Fed. Cir. 2010)

-10-

(holding that a letter asserting infringement was sufficient to demonstrate knowledge under § 271(c)).[1]

Fourth and finally, the GenStrip is specifically made for use with LifeScan's OneTouch Ultra meters, and has no other intended use or purpose. It is not a "staple article of commerce capable of a substantial non-infringing use" under § 271(c). There are no other FDA-approved uses of the Shasta GenStrip, and no substantial non-infringing uses. *See* Meyerhoff Decl. at ¶ 42. Where, as here, the patentee "ma[kes] out a prima facie showing that [the accused infringers'] product was not 'suitable for a substantial non-infringing use,'" the burden shifts to the accused infringer to show that the users actually will use its product "in a non-infringing manner." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1361 (Fed. Cir. 2006). Defendants cannot make that showing because the only use for the GenStrip is in combination with LifeScan's OneTouch Ultra test strips, and that use infringes claim 3 of the '105 patent.

In sum, Defendants are liable under § 271(c) for contributing to their customers' direct infringement of claim 3 of the '105 patent.[2]

### c. Sales of OneTouch Ultra Meters Do Not Exhaust LifeScan's Rights Under the '105 Patent

At the recent hearing on LifeScan's motion for leave to amend the complaint to add the '105 patent, DDC relied on *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008), in raising an "exhaustion" argument that DDC had not raised in its motion papers. Where the exhaustion doctrine, sometimes called the "first sale" doctrine, is applicable, it limits a patentee's rights with respect to downstream users of its products. DDC's argument, at core, is that the sale of LifeScan's meter – a component of the patented method – precludes LifeScan from asserting its

---

[1] *See also Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1353 (Fed. Cir. 2010) (the "requisite knowledge for contributory infringement" is "presumed" from the Defendants' knowledge of the patent and the absence of substantial noninfringing uses for their accused product); *Richoh Co. v. Quanta Computer, Inc.*, 550 F.3d 1325, 1338 (Fed. Cir. 2008) (it is appropriate to presume that one who sells a component "*that has no substantial noninfringing use*…does so with the intent that the component will be used to infringe.") (italics in original).

[2] In addition, Defendants are inducing infringement under Section 271(b) of the patent statute, 35 U.S.C. § 271(b). That section states that "[w]hoever actively induces infringement of a patent shall be liable as an infringer."

-11-

1   patent rights with respect to the sale of strips for use in the meter.  This contention would relegate

2   LifeScan to the role of giving away its meters or selling them at a loss, while denying it the patent

3   right to sell its compatible test strips at a profit.  In fact, *Quanta* mandates the opposite conclusion.

4   It is LifeScan's test strips, not its meters, that "substantially embod[y]" the invention of the '105

5   patent.  *Id.* at 633.  As a result, LifeScan does not exhaust its patent rights by distributing the meters

6   and instead retains the right to insist on its patent monopoly in the use of its strips to practice the

7   invention claimed in the '105 patent.

8           In *Quanta*, the patentee (LGE) had licensed Intel to make and sell certain

9   microprocessors and chipsets that were components required to practice LGE's patents.  Intel sold its

10  chips to Quanta, which combined them with standard parts to form computers.  LGE sued Quanta for

11  patent infringement, asserting that the combination of Intel's chips with standard, non-Intel

12  electronics practiced LGE's patents.  The Supreme Court found that LGE had exhausted its patent

13  rights by the sale of the Intel chips.  This was because "[e]verything inventive about each patent

14  *[was] embodied in the Intel Products*," and Intel's products "*all but completely practice[d] the*

15  *patent*."  *Quanta*, 553 U.S. at 633.  Intel's chips "substantially embodied" the asserted patents

16  because the chips "had no reasonable noninfringing use and *included all the inventive aspects of the*

17  *patented methods*."  *Id.* at 638 (emphasis added).  "The authorized sale of an article that substantially

18  embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking

19  patent law to control postsale use of the article."  *Id.* at 638 (emphasis added).

20          The *Quanta* Court relied on *United States v. Univis Lens Co.*, 316 U.S. 241 (1942).

21  In *Univis*, the Court held that the sale of bi- and trifocal lens blanks exhausted the patent holder's

22  rights in the finished lenses.  "The essential, or inventive, feature of the Univis lens patents was the

23  fusing together of different lens segments to create bi- and trifocal lenses," *Quanta, 553 U.S.* at 632,

24  and the only step needed to practice the patents was grinding and polishing the lens blanks into

25  finished lenses – a standard process in the field.  Moreover, in selling the lens blanks, the patent

26  owner had already received in the purchase price "consideration and compensation for both" the lens

27

28                                              -12-

blanks and the right to finish them, and had thus "demanded and received" the "reward" for both "the article and the invention which it embodies."

The *Quanta* Court concluded that "*Univis* governs this case." (553 U.S. at 631):

> As the Court there explained, exhaustion was triggered by the sale of the lens blanks because their only reasonable and intended use was to practice the patent and because they "embodie[d] essential features of [the] patented invention."   Each of those attributes is shared by the microprocessors and chipsets Intel sold to Quanta under the License Agreement.

"Here, as in *Univis* the incomplete article substantially embodies the patent because the only step necessary to practice the patent is the application of common processes or the addition of standard parts."  *Id.* at 633.

DDC's theory is that LifeScan's sales of its OneTouch Ultra meters exhaust its patent rights under *Quanta*, leaving LifeScan without the ability to object to the use of GenStrips with LifeScan's meter.  But this case is the polar opposite of *Quanta* and *Univis*.  First, LifeScan's meters – unlike Intel's microchips and Univis's lens blanks – do not "substantially embody" the invention of claim 3 of the '105 patent.  LifeScan's meters do *not* embody "[e]verything inventive" about the '105 patent."  *Quanta*, 553 U.S. at 633.  The meters do *not* "include[ ] all the inventive aspects of the patented methods."  *Id.* at 638 (emphasis added).  To the contrary, the *test strips*, not the meters, contain the core inventive features of the '105 patent.  Figures 1-7 of the '105 patent depict the test strips or aspects of those strips; none of the figures even illustrates the meters.  Similarly, the text of the '105 patent is largely devoted to a description of the test strips.  The test strips are anything but standard parts.  They embody key aspects of the invention and are usable only with LifeScan's meters.  The meters perform relatively simple programming steps of the claimed methods.  It is only when the meters are used in combination with novel test strip designed to have the '105 patent's patented configuration that all of the steps of the claimed methods are performed.  *See* Meyerhoff Decl. at ¶¶ 43-48.

Second, LifeScan's meters – unlike the chips in *Quanta* and the lens blanks in *Univis* – are capable of a "reasonable noninfringing use."  553 U.S. at 638.  The meters are designed to, and do, measure blood glucose, whether a user takes advantage of the DoubleSure Technology or not.

-13-

1  There are a variety of ways that Defendants could have designed test strips to work to measure

2  glucose with LifeScan's meters that did not use the specific sensor configuration claimed in the '105

3  patent.  *See* Meyerhoff Decl. at ¶¶ 43-48.  That is because LifeScan's meters do not substantially

4  embody the asserted claims of the '105 patent.

5  Third, in contrast to *Univis*, LifeScan does *not* receive its full "reward" for the

6  patented invention when it sells its OneTouch Ultra meters.  *Univis*, 316 U.S. at 251.  Rather,

7  LifeScan does not earn a profit on its OneTouch Ultra meters.  LifeScan distributes more than half of

8  its meters free of charge to physicians and patients, and distributes the rest at sharply reduced prices

9  below its actual costs.  Menziuso Decl., ¶ 39.  LifeScan does so with the intent and expectation that

10  it will receive its full reward for its patented invention over the course of a patient's therapy when the

11  patient purchases LifeScan's test strips for use with meters that LifeScan distributed without charge

12  or at nominal cost.  *Id*.

13  Under the principles of *Quanta* and *Univis*, LifeScan's sale of meters does not

14  extinguish its right to profit from the '105 patent.

15  **d.  Purchasers of LifeScan's Meters Do Not Have An Implied License to**
    **Practice the '105 Patent With the Shasta GenStrip**

16  When DDC opposed LifeScan's motion for leave to amend the complaint to assert the

17  '105 patent, it offered an incorrect argument that direct infringement does not occur on the theory

18  that LifeScan's customers have an "implied license" to use LifeScan's OneTouch Ultra meters with

19  another company's test strips.  D.E. 160 at 7.  Courts have rejected that argument and it has no merit.

20  An "implied license" defense has prevailed in "relatively few" cases, *Bandag, Inc. v.*

21  *Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 925 n.32 (Fed. Cir. 1984), and the burden of establishing

22  the defense rests with the accused infringer.  *Carborundum Co. v. Molten Metal Equip. Innovations*,

23  72 F.3d 872, 878 (Fed. Cir. 1995).  An "implied license" defense cannot prevail unless "the

24  circumstances of the sale … '*plainly indicate* that the grant of a license should be inferred.'"  *Met-*

25  *Coil Systems Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 686 (Fed. Cir. 1986) (emphasis added).

-14-

Here, the circumstances of the sale of LifeScan's OneTouch Ultra meters indicates the exact opposite. LifeScan's OneTouch Ultra monitors are sold in packaging with a notice that expressly negates any basis for an implied license:

> Use of the monitoring device included here is protected under one or more of the following U.S. patents: 7,250,105…. Purchase of this device does not act to grant a use license under these patents. Such a license is granted only when the device is used with OneTouch® Ultra® Test strips.

Ex. B to Menziuso Decl.

In its recent decision granting LifeScan's motion to file an amended complaint adding the '105 patent, this Court took note of "the above express limitation to the license found on the packaging for Plaintiffs' product" and concluded that Defendants "have not proven that Plaintiffs' warning does not preclude the finding of an implied license." D.E. 169 at 6. That decision is consistent with other cases involving the notice on LifeScan's packaging.

In *LifeScan Inc. v. Polymer Tech. Int'l Corp.*, No. C94-672R, 1995 U.S. Dist. LEXIS 4916, *41-45 (W.D. Wash. Jan. 3. 1995), the court relied on LifeScan's packaging notice in rejecting arguments that customers have an implied license to use LifeScan's meters with test strips other than LifeScan's test strips. The court held that the notice on the packaging for LifeScan's glucose meters "*preclud[es] a finding of implied license*," *id.* at *45 (emphasis added), and stated that the defendant "failed to convince the court that the [notice] placed on the [packaging for the] LifeScan One Touch meters … is ineffectual, as a matter of law, to restrict the use of the meter." *Id.*[3] The same conclusion applies here.

In addition, the fact that customers obtain LifeScan's glucose monitors for free or at heavily rebated prices makes it all the more unlikely that consumers would reasonably believe they have an implied license to use other company's test strips with LifeScan's monitors. These facts weigh heavily against a finding of implied license. *See Arizona Cartridge Remanufacturers Ass'n. v.*

---

[3]  *See also LifeScan, Inc. v. Can-Am Care Corp.*, 859 F. Supp. 392, 395 (N.D. Cal. 1994) (denying defendants' motion for summary judgment on an implied license defense, and stating that "[the court] cannot determine that, as a matter of law, the license restriction [on the packaging of LifeScan's monitors] is ineffective" to negate an implied license to use the monitors with other company's test strips).

-15-

1  *Lexmark Int'l*, 421 F.3d 981, 988 (9th Cir. 2005) (restrictions on the use of a printer cartridge were

2  enforceable because customers "(1) have notice of the condition, (2) have a chance to reject the

3  [condition] on that basis and (3) receive consideration in the form of a reduced price in exchange for

4  the limits placed on reuse of the cartridge").

5          In light of all the relevant facts, Defendants cannot meet their burden of proving that

6  the circumstances of LifeScan's meter sales "plainly indicate that the grant of a license should be

7  inferred." *Met-Coil*, 803 F.2d at 686.

8          2.      **Likelihood of Success for the '105 Patent:  Validity/Enforceability**

9          Defendants have not asserted any substantial basis for challenging the validity or

10  enforceability of the '105 patent.  *See* Meyerhoff Decl., ¶ 49.

11  **B.     Sales of the GenStrip Would Irreparably Harm LifeScan**

12          The second factor for a preliminary injunction is irreparable harm.  This factor also

13  strongly favors a preliminary injunction.

14          As the Federal Circuit has held, "price erosion, loss of goodwill, damage to

15  reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."

16  *Celsis in Vitro, Inc. v. Cellzdirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (affirming the grant of

17  preliminary injunction); *see also Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir.

18  2008) (affirming the grant of a preliminary injunction); *Robert Bosch LLC v. Pylon Mfg. Co.*, 659

19  F.3d 1142, 1151 (Fed. Cir. 2011) (finding irreparable harm and reversing the denial of a permanent

20  injunction).  Sale of the GenStrip would cause all of these types of harm, and "the mere possibility of

21  future monetary damages does not defeat a motion for a preliminary injunction."  *Celsis*, 664 F.3d at

22  930.

23          The GenStrip is designed to be a substitute for LifeScan's test strips, for use in

24  conjunction with LifeScan's OneTouch Ultra meters.  As a result, the parties are in "direct

25  competition."  *Bosch*, 659 F.3d at 1151.  Sales of the GenStrip have a devastating effect on LifeScan

26  sales, and that effect would go beyond lost sales and profits.  It could pose an existential challenge,

27  placing LifeScan's entire business in jeopardy.  Defendants should not be permitted to use LifeScan's

28                                              -16-

1   patented technology without permission to compete with LifeScan and irreparably injure its

2   business.

3        **1.      Sales of the GenStrip Would Decimate LifeScan's Business**

4              The GenStrip is designed and cleared for use with "for use with [LifeScan's]

5   OneTouch® Ultra®, Ultra® 2 and UltraMini® Meters purchased before July 2010."  There are no

6   other uses.  Menziuso Decl., ¶ 30.  Defendants will promote the GenStrip as "comparable" to test

7   strips sold by the "platform manufacture," *i.e.*, LifeScan, but "priced significantly (50%) lower."  *Id.*

8   ¶ 19.

9              Because the GenStrip is designed and approved for use with LifeScan's OneTouch

10  Ultra meters, as a substitute for LifeScan's OneTouch Ultra test strips, Shasta GenStrip sales would

11  have a crushing impact on LifeScan sales.  And because Defendants' announced plan is to sell the

12  GenStrip at approximately half the price of LifeScan's OneTouch Ultra test strips, the losses to

13  LifeScan will vastly exceed the dollar amount of GenStrip sales.

14             The impact on LifeScan's business would be crushing.  Statements on Defendant

15  DDC's website have indicated that Defendants expect to enjoy more than $170 million in U.S. sales

16  of the GenStrip in its first full year on the market.  *See* Menziuso Decl., ¶ 22.  That estimate is not

17  unreasonable.  *Id.* ¶ 23.  Because GenStrip will be sold at half the price of LifeScan's, the impact on

18  LifeScan will be significantly greater and constitute a significant loss of its approximately $1 billion

19  in annual sales revenues.  DDC expects that sales of the GenStrip will sharply increase after the first

20  year.  *Id.* ¶ 22.

21             The losses to LifeScan would run to hundreds of millions of dollars.  And that is only

22  part of the story.  GenStrip's low prices would force LifeScan to slash its price to compete.  The

23  resulting loss of revenues and profits could decimate LifeScan's OneTouch Ultra business, placing

24  that entire business in severe jeopardy.  This is an egregious example of irreparable harm.  *See, e.g.,*,

25  *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.2 (D.C.

26  Cir. 1977);  *Ajilon Prof'l Staffing, LLC v. Griffin*, No. CV-09-561, 2009 U.S. Dist. LEXIS 49328,

27  *10 (D. Ariz., May 29, 2009).

28                              -17-

2.     **Loss of Market Share**

"[L]oss in market share" can itself be irreparable harm.  *Bosch*, 659 F.3d at 1151; *see also Purdue Pharma,* 237 F.3d at 1368 (Fed. Cir. 2001).  That is particularly true here.  LifeScan is the leader in the United States in the market for disposable blood glucose test strips.  As the market leader, LifeScan enjoys a preeminent position, to which other companies aspire.  Major competitors such as Abbott Diabetes Care, Roche and Bayer vie with LifeScan for leadership in this market.  Menzuiso Decl., ¶ 7.  Sales of the GenStrip, as a replacement for LifeScan's OneTouch Ultra test strips, would sharply reduce LifeScan's market share and jeopardize its position as the market leader.  This would injure LifeScan in ways that could not be compensated through an award of money damages.  *Bosch*, 659 F.3d at 1151; *Purdue Pharma*, 237 F.3d at 1368.

3.     **Questions About Defendants' Ability to Pay a Damage Award**

"[Q]uestions about [Defendants'] ability to satisfy a judgment" present another recognized form of irreparable harm.  *Bosch*, 659 F.3d 1154; *see also Buffalo Wings Factory, Inc. v. Mohd*, 1:07-CV-612 JCC 2008, U.S. Dist. LEXIS 86360, *12 (E.D. Va. Oct. 23, 2008) ("The harm caused by a defendant's inability to pay damages … can be considered irreparable.").

There is every reason to believe that Defendants would not have sufficient resources to pay an award of lost profits on their infringing sales.  Shasta's counsel has stated in open court that his client has "no product and no income stream whatsoever."  D.E. 137 at 11.  DDC stated in its publicly available S.E.C. filings for 2011, the last full year for which information is publicly available, that it had suffered a net loss of more than $2 million.  Menziuso Decl., Ex. V at F-6.  For the six months ending June 30, 2012, DDC reported to the S.E.C. that it was operating at a net loss and that it had just over $7,000 in net cash.  *Id.* Ex. W at 5.  Defendant PharmaTech Solutions, Inc. is DDC's wholly-owned subsidiary.  Information concerning the financial condition of the remaining Defendant, Conductive, is not publicly available.

There is no reason to expect that the Defendants – individually or collectively – would be able to satisfy an award of lost profits damages running to hundreds of millions of dollars

-18-

1    for the injury from their infringing sales.  Their apparent inability to pay an award of LifeScan's lost

2    profits is, in itself, irreparable harm.  *Bosch*, 659 F.3d 1154.

3        **4.      Price Erosion**

4            Defendants have stated that they plan to sell the GenStrip at "significantly discounted

5    prices," *Celsis*, 664 F.3d at 930 – "approximately one-half" the price of OneTouch Ultra test strips.

6    Menziuso Decl., Exs. R, S.  LifeScan would need to lower the price of OneTouch Ultra test strips to

7    compete with this lower priced alternative.  Once the price of OneTouch Ultra strips is lowered, it

8    would be difficult or impossible to raise the price to earlier levels, even if the GenStrip is eventually

9    removed from the market.  Attempting to do so would cause significant consumer anger and

10   resentment.  As a result, sales of the GenStrip would cause a long-lasting drop in prices for

11   OneTouch Ultra strips.  *Id.* ¶¶ 36-39.  This "irreversible price erosion," by itself, constitutes

12   irreparable harm.  *Bosch*, 659 F.3d at 1153-54; *see also id.* at 1155; *Sanofi-Synthelabo v. Apotex,*

13   *Inc.*, 470 F.3d 1368, 1382 (Fed. Cir. 2006).

14       **5.      Injury to LifeScan's Goodwill**

15           Sales of a test strip that can be used in place of LifeScan's OneTouch Ultra test strips,

16   at a much lower price, would generate customer resentment against LifeScan, undermining the

17   goodwill that LifeScan has worked hard to develop.  The resulting harm to LifeScan would be

18   difficult or impossible to quantify, and would occur even if LifeScan reduced the price of OneTouch

19   Ultra strips in response to the introduction of the Genstrip.  *See* Menziuso Decl., ¶¶ 36-39.

20       **6.      Loss of Revenues for R&D Efforts**

21           The Federal Circuit has recognized a reduction in revenues for research and

22   development activities as another type of irreparable harm.  *Bio-Technology Gen. Corp. v.*

23   *Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996).  A decrease in LifeScan's revenues would

24   reduce the funds it has available for research and development and lead to inevitable layoffs.  *See*

25   Menziuso Decl., ¶¶ 46-48.  The resulting harm to LifeScan – and to the public in general – is

26   impossible to quantify.  No one ever will know what potentially life-saving products could have

27   been developed if LifeScan had additional funds available to invest in research and development.

28                                    -19-

### 7.   Injury to Reputation

LifeScan's OneTouch Ultra test strips have been on the market for more than eleven years and have a proven track record when used with LifeScan's OneTouch Ultra meters.  The same cannot be said for the GenStrip.  If there are manufacturing or design defects or problems with GenStrip test strips, then customers would be likely to blame LifeScan and its OneTouch meters for any resulting problems, even if the cause were Defendants' GenStrip product.  This would injure LifeScan's reputation and would further harm the goodwill it has worked hard to develop.  *See* Menziuso Decl., ¶ 28.

These concerns are heightened by the unusual conditions of FDA clearance for the GenStrip.  The GenStrip is only approved for calibration codes 4, 10 and 13, and for LifeScan meters sold before July 2010.  *Id.* Ex. Q at 4.  Users of LifeScan's OneTouch Ultra meters are accustomed to meters that are pre-set to a single calibration code (code 25) and are accustomed to not entering a one of several calibration codes before using a test strip.  If GenStrip users do not re-set the calibration code on the meter, or do not correctly set it to a calibration code that matches the code for GenStrip, then users would unfairly attribute any resulting problems to LifeScan.  *Id.* ¶ 33.

### 8.   Loss of the Right to Exclude

Sales of the GenStrip also would deprive LifeScan of the principal value of the patents, *i.e.*, the right to exclude infringers.  "Absent a preliminary injunction, [LifeScan] would lose the value of [the] patent …."  *Celsis*, 664 F.3d at 931; "'[T]he principal value of a patent is its statutory right to exclude ….'"  *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 2006 WL 3446144, *3 (N.D. Ill. Nov. 29, 2006), quoting *Reebok Int'l, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994); *see also id.* (quoting *Reebok*, 32 F.3d at 1557) (the "'nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole.'"); *Martek Biosciences Corp. v. Nutrinova, Inc.*, 520 F. Supp. 2d 537, 558-59 (D. Del. 2007) (the statutory right to exclude is a "benefit associated with patent rights that cannot be quantified in money damages.").

-20-

1    Where, as here, the patentee and the infringer directly compete then "[m]onetary

2  damages generally are not an adequate remedy against future infringement because the central value

3  of holding a patent is the right to exclude others from using the patented product."  *Smith & Nephew,*

4  *Inc. v. Synthes (U.S.A.)*, 466 F. Supp. 2d 978, 984 (W.D. Tenn. 2006).  The parties to this case "are

5  head-to-head competitors, and [LifeScan] has a right, granted by Congress, not to assist its rival with

6  the use of proprietary technology."  *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 613

7  (D. Del. 2007).

8         **9.    Injury from False Advertising and Promotion**

9    LifeScan has filed a separate complaint and motion for a preliminary injunction

10  alleging that Defendants, by their packaging and promotion of the GenStrip, have confused

11  consumers and infringed LifeScan's trademarks and trade dress.  Of course, Defendants' decision to

12  market the GenStrip in unlawful ways is independent of the patent law violations alleged here, but it

13  is also true that the irreparable injury alleged in that case would not have occurred if Defendants had

14  respected LifeScan's patent rights and foregone its effort to market the GenStrip.

15  **C.    The Balance of the Equities Favors a Preliminary Injunction**

16    The third factor is the balance of equities.  This factor weighs heavily in favor of a

17  preliminary injunction.  Absent an injunction, Defendants would be using LifeScan's patented

18  technology without its permission to compete with LifeScan and irreparably injure its business in

19  many ways.  *See* Menziuso Decl., ¶¶ 3,61.  All of the equities in this situation favor LifeScan.

20    Defendants were aware of the patents-in-suit at all relevant times, but chose to

21  proceed nonetheless in developing their infringing product.  Even if an injunction would harm

22  Defendants, "[o]ne who elects to build a business on a product found to infringe cannot be heard to

23  complain if an injunction against continuing infringement destroys the business so elected."  *Bosch*,

24  659 F.3d at 1156 (quoting *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003, n.12 (Fed. Cir.

25  1986)); *see also Sanofi-Synthelabo*, 470 F.3d at 1382 (balance of hardships favors the patentee

26  where the infringer has taken a "calculated risk" by launching its product before a final judgment).

27  This conclusion applies with particular force where, as here, the parties are direct competitors and

28                                                    -21-

1    denial of an injunction would "requir[e] [the patentee] to compete against its own patented invention,

2    with the resultant harms, … plac[ing] a substantial burden on [the patentee]." *Bosch*, 659 F.3d at

3    1156.  That would put LifeScan in a position antithetical to the patent grant, of "assist[ing] its rival

4    with the use of proprietary technology," *Novozymes*, 474 F. Supp. 2d at 613.  In these circumstances,

5    "there can be little doubt that the balance of hardships favors [LifeScan]." *Amgen Inc,. v. F.*

6    *Hoffmann-LaRoche Ltd.*, No. 05-12237, 2008 WL 4452454 at*48 (D. Mass. Oct. 2, 2008)

7           The analysis is not altered by the importance that the infringing product may have to

8    Defendants' businesses or by the fact that Defendants are smaller than LifeScan and its parent

9    Johnson & Johnson.  "A party cannot escape an injunction simply because it is smaller than the

10   patentee or because its primary product is an infringing one." *Bosch*, 659 F.3d at 1156.

11   **D.     The Public Interest Favors a Preliminary Injunction**

12          The fourth and final factor – the public interest – also weighs heavily in favor of an

13   injunction.  As the Supreme Court has recognized, "[t]he patent laws promote … progress by

14   offering a right of exclusion for a limited period as an incentive to inventors to risk the often

15   enormous costs in terms of time, research and development" needed to create a new product and

16   bring it to the market.  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974).  Similarly, the

17   Federal Circuit has "long acknowledged the importance of the patent system in encouraging

18   innovation." *Sanofi-Synthelabo*, 470 F.3d at 1383.  Indeed, the "'encouragement of investment-

19   based risk is the fundamental purpose of the patent grant, and is based directly on the right to

20   exclude.'" *Id.* (citation omitted).

21          These incentives are particularly important in the field of medical products, both

22   drugs and devices.  *See id.* (recognizing that enjoining patent infringement serves the important role

23   of "provid[ing] incentive to the innovative drug companies to continue costly development efforts.").

24   *Amgen*, 2008 WL 4452454, is instructive (*id.*, *62):

25                  Were courts to refuse injunctions on the [grounds that costs might
               be reduced and some patients might benefit], then pharmaceutical

26                  patents would be worth far less than they are today because they
               would no longer include a right to exclude infringers from the

27                  market.  The diminishing returns would disincentivize research and

28                  -22-

development for pathbreaking drugs by lowering the expected value of discovery.  By contrast, granting injunctions encourages companies to devote their energies toward developing drugs that will satisfy unmet medical needs.  Were it possible to obtain market entry by making incremental improvements to existing drugs, it is doubtful that companies designed to generate discoveries could exist.

The Federal Circuit has endorsed this reasoning.  In *Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d 1341 (Fed. Cir. 2008), the district court granted a preliminary injunction against the sale of an infringing drug, stating (*id.* at 1362):

The Court recognizes the public interest in competition in the pharmaceutical market.  It also recognizes, however, the public interest in creating beneficial and useful products and the cost involved in that process.  To the extent that this Court has found a substantial likelihood that the '718 patent is valid and enforceable, there can be no serious argument that public interest is not best served by enforcing it.

In affirming the grant of a preliminary injunction, the Federal Circuit quoted the above reasoning with approval and gave the district court credit for "appreciat[ing] that the public interest includes consideration of whether … the incentive for discovery and development of new products is adversely affected."  *Id.*  The Federal Circuit stated:

The statutory period of exclusivity reflects the congressional balance of interests, and warrants weight in considering the public interest.  In *Sanofi-Synthelabo [v. Apotex, Inc.]*, 470 F.3d [1368,] at 1383 [Fed. Cir. 2006], this court referred to the significant "public interest in encouraging investment in drug development and protecting the exclusionary rights conveyed in valid pharmaceutical patents."  *Id.* at 1362-63

Courts have recognized the strong public interest in enjoining the sale of infringing drugs or medical devices where, as here, the infringing product competes with a product sold by the patentee.  *See, e.g., Celsis*, 664 F.3d 922 (affirming a preliminary injunction against a device for preparing multi-cryopreserved hepatocytes, a type of liver cell); *Abbott Laboratories*, 544 F.3d 1341 (affirming a preliminary injunction against a pharmaceutical product); *Sanofi-Synthelabo*, 470 F.3d 1368 (affirming a preliminary injunction against an infringing platelet aggregation inhibiting agent); *Amgen*, 2008 WL 4452454 (granting a permanent injunction against a recombinant product used for treatment of anemia); *Smith & Nephew*, 466 F. Supp. 2d at 985 ("As a general matter, the public

-23-

maintains an interest in protecting the rights of patent holders, and injunctions serve that interest.")

(granting a permanent injunction against sale of a device to treat femoral fractures).

The fact that Defendants plan to sell the Shasta GenStrip at a lower price than

LifeScan's test strips does not alter the analysis of the public interest factor.  "Selling a lower priced

product does not justify infringing a patent," *Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1369,

1382 (Fed. Cir. 2005), quoting *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 991 (Fed.

Cir. 1993), and price considerations do not trump the exclusionary rights conveyed by medical

device patents.  *Id.*  Defendants took "a calculated risk that [they] might infringe" a valid patent

when they decided to develop the Shasta GenStrip with knowledge of LifeScan's patents.  *Smith*

*Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir 1983).  Having taken that risk,

Defendants should "not now be heard to say that public policy is in [their] favor."  *Id.*

## CONCLUSION

For the reasons set forth above, this Court should enter a preliminary injunction

barring Defendants from selling or offering to the sell the infringing Shasta GenStrip.

Dated:  December 14, 2012

_/s/ Eugene M. Gelernter_____
Gregory L. Diskant (admitted *pro hac vice*)
Eugene M. Gelernter (admitted *pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
Facsimile:  (212) 336-2222
E-mail:     gldiskant@pbwt.com
            emgelernter@pbwt.com

Richard Goetz (S.B. #115666)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:   (213) 430-6000
Facsimile:   (213) 430-6407
E-Mail:      rgoetz@omm.com

Sue Roeder (S.B. #160897)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA  94025
Telephone:   (650) 473-2600
Facsimile:   (650) 473-2601
E-Mail:      sroeder@omm.com

Attorneys for Plaintiffs LIFESCAN, INC.
and LIFESCAN SCOTLAND, LTD

-24-