WILLIAM RUDY (*pro hac vice*)
wrudy@lathropgage.com
JOHN J. SHAEFFER (SBN 138331)
jshaeffer@lathropgage.com
CAROLE HANDLER (SBN 129381)
chandler@lathropgage.com
LATHROP & GAGE LLP
1888 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:    (310) 789-4600
Fax:    (310) 789-4601
Attorneys for Defendants
Decision Diagnostics Corp. and Pharmatech Solutions, Inc.

ROBERT P. ANDRIS (SBN 130290)
randris@rmkb.com
LAEL D. ANDARA (SBN 215416)
landara@rmkb.com
ROPERS, MAJESKI, KOHN & BENTLEY
1001 Marshall Street, Suite 500
Redwood City, CA 94063-2052
Telephone    (650) 364-8200
Facsimile    (650) 780-1701
Attorneys for Defendants
Shasta Technologies, LLC and Conductive Technologies, Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIFESCAN SCOTLAND, LTD and LIFESCAN, INC.<br><br>Plaintiffs,<br><br>vs.<br><br>SHASTA TECHNOLOGIES, LLC, PHARMATECH SOLUTIONS, INC., DECISION DIAGNOSTICS CORP. and CONDUCTIVE TECHNOLOGIES, INC.<br><br>Defendants. | CASE No.    11-CV-4494 WHO<br><br>**DECLARATION OF KEITH BERMAN IN RESPONSE TO ORDER TO SHOW CAUSE WHY LIFESCAN SHOULD NOT BE HELD IN CONTEMPT (DKT. No. 336)**<br><br>**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED** |

# DECLARATION OF KEITH BERMAN

I, Keith Berman, hereby declare as follows:

1. I am the Principal Executive Officer and Chief Financial Officer of Decision Diagnostics, Corp., fka InstaCare Corp. ("Decision Diagnostics"), and the President of PharmaTech Solutions Corp. ("PharmaTech Solutions"), both of which are named as defendants in this lawsuit. I am over eighteen years old and competent in all respects to make this Declaration. I have personal knowledge of the facts and circumstances set forth below, unless otherwise specified.

2. As I noted in my May 2, 2013, Declaration in Support of Defendants' Motion for OSC re Contempt and for Further Relief and Sanctions, Defendants maintain as strictly confidential the identity of their customers. Defendants' customers consistent primarily of distributors, who contract directly with Defendants to purchase large quantities of the GenStrip as well as other products. I understand counsel for Lifescan has identified, and sent letters to, online retailers who offer for sale the GenStrip. Online retailers are customers of Defendants' customers and publicly identify themselves as GenStrip retailers in connection with selling products to consumers. I do not consider these online retailers to be Defendants' "customers," whose identity Defendants keep confidential. I also understand that counsel for Lifescan has identified, and sent letters to, owners, operators and proprietors of independent pharmacies who offered for sale the GenStrip. Independent pharmacies are also customers of Defendants' customers and publicly identify themselves as GenStrip retailers in connection with selling products to consumers. I do not consider these retailers to be Defendants' "customers," whose identity Defendants keep confidential.

3. Decision Diagnostics and PharmaTech Solutions have suffered profound financial losses as a result of the letters from Gregory Diskant, counsel of record for Lifescan, to Defendants' distributors and to the distributors' customers, which consistent primarily of small, independent bricks-and-mortar pharmacies. Mr. Diskant and/or his law firm identified Defendants' distributors by misusing material that Defendants had designated HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY under the Court's Protective Order. I am informed and believe that Mr. Diskant and his law firm identified the distributors' customers, *i.e.*, the small bricks-and-mortar pharmacies, by

1

comparing the identities of aforementioned distributors produced in this litigation and highly confidential documents that Defendants have produced in other litigation that discloses to whom Defendants' distributors sell product. As I noted in my May 2, 2013, and based on my experience with Lifescan in prior litigation, Lifescan and its counsel have established a pattern and practice of misusing sealed documents in one case to further Lifescan's interest in another.

4. Mr. Diskant's letters falsely asserted that these third party distributors and retailers were bound by this Court's orders and threatened to sue the third parties for doing business with the Defendants. Coming from Lifescan and its parent company Johnson & Johnson, the multi-billion dollar, multi-national medical device and pharmaceutical company, the message was heard loud and clear. While few businesses relish the thought of engaging in litigation, fewer still are willing to risk litigation with opponents that enjoy relatively limitless resources to spend on lawyers.

5. There are over 8500 independent pharmacies in the United States. I do not know how many of these independent pharmacies received letters from Mr. Diskant. I have, however, received calls from many of these independent pharmacies demanding that Defendants buy back their existing GenStrip inventory. Decision Diagnostics and PharmaTech Solutions have requested that Mr. Diskant produce copies of all of his letters to these independent pharmacies. Mr. Diskant refused to cooperate in this regard.

6. Before the GenStrip was approved by the FDA, Defendants engaged a financial analyst to forecast GenStrip sales once it hit the market. Dkt. No. 176-6, Menzuiso Decl., Ex. "U." That analyst forecasted that the GenStrip would generate more than $170 million in domestic revenue the first full year of sales. *Id.* Notably, Lifescan relied upon that estimate in conjunction with its Motion for Preliminary Injunction. Dkt. No. 176, at 17:14-20. Unfortunately, while the GenStrip was cleared for sale by the FDA and while Defendants have been legally entitled to sell the GenStrip for approximately nine months, actual GenStrip revenues have fallen well short of these projections.

7. Likely as intended, Mr. Diskant's letters turned Defendants into radioactive pariahs that few within the medical supply industry will now dare approach. No distributor is willing purchase the GenStrip for fear of being sued by Johnson & Johnson and/or Lifescan. Since Mr.

Diskant sent his letters, Decision Diagnostics and PharmaTech Solutions have been forced to distribute the GenStrip themselves and at a loss. While the GenStrip has been on the market for nine months, Defendants' gross revenues from GenStrip sales are less than $100,000. The actual financial losses that my companies have suffered as a result of Mr. Diskant's letters are enormous. I strongly believe that all of these losses are a result of Lifescan's misconduct.

8. In addition to lost future sales, Mr. Diskant's conduct caused Decision Diagnostics and PharmaTech Solutions to lose sales already made. In each of the following instances, Defendants received a purchase order from a distributor. In each case, after the distributor and/or the distributor's customers received a letter from Mr. Diskant, Defendants were not able to realize the full benefit contemplated by the purchase order. I have identified below the difference between the value of the purchase order and the lessened benefit that Decision Diagnostics and PharmaTech Solutions actually received because of Mr. Diskant's letters.

9. ▮

a. ▮ agreed to purchase 24,000 units of GenStrip 50's at ▮ per unit. That agreement is reflected in a purchase order that was produced to Lifescan bearing the notation HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY, a true and correct copy of which is attached hereto as Exhibit "A." The purchase agreement reflects a total purchase price of ▮

b. After and because of receiving a threatening letter from Mr. Diskant, a true and correct copy of which is attached hereto as Exhibit "B," ▮ cancelled the purchase order and refused to take any further shipments in accordance with its terms.

c. By the time ▮ cancelled the purchase order, ▮ had been shipped ▮ units. In subsequent negotiations, ▮ agreed to pay for the units it had already received, but refused to accept any further units under the order and demanded I give them ▮ additional units free of charge, which I agreed to do.

d. As a result of Mr. Diskant letter to ▮ Decision Diagnostics and PharmaTech Solutions suffered $84,082 in net financial losses. The cost to my

3



1  companies for each GenStrip unit is approximately ▮ As ▮ agreed to buy the GenStrip
2  at ▮ per unit, Decision Diagnostics and PharmaTech Solutions expected to make ▮ for each
3  unit sold. However, as a direct result of Mr. Diskant's letter, ▮ refuse to accept shipment and
4  to pay for ▮ units ▮ of the 24,000 units contemplated by the purchase order, and
5  also demanded to receive another ▮ units free of charge. Therefore, Decision Diagnostics and
6  PharmaTech Solutions lost net revenue from sales under the purchase order was $54,978 ▮
7  ▮ and Decision Diagnostics and PharmaTech Solutions net loss from giving away ▮ units
8  was $29,104 ▮.
9     10. ▮
10      a. ▮ agreed to purchase 24,000 units of GenStrip 50's at
11  ▮ per unit. That agreement is reflected in a purchase order that was produced to Lifescan
12  bearing the notation HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY, a true and correct
13  copy of which is attached hereto as Exhibit "C." The purchase agreement reflects a total purchase
14  price of ▮
15      b. After receiving a threatening letter from Mr. Diskant and/or ▮
16  customers receiving such a letter, ▮ cancelled the purchase order and refused to take any
17  further shipments in accordance with its terms. On information and belief, ▮ refused to
18  perform on the purchase order because of letters sent to ▮ and/or ▮ retail partners.
19  While ▮ never provided me with a copy of the letter it received from Mr. Diskant, ▮
20  customers did notify me they had received such letters and that the letter had caused ▮ to cancel
21  the purchase order.
22      c. By the time ▮ cancelled the purchase order, ▮ had been shipped
23  approximately 4,800 units. ▮ demanded that Decision Diagnostics and PharmaTech Solutions
24  buy back all of the units that ▮ had not already sold. As ▮ had only sold around 300 units
25  by that time, Decision Diagnostics and PharmaTech Solutions, accordingly, was forced to buy back
26  approximately 4,500 units

4

1      d.      As a result of Mr. Diskant letter to ▓▓▓ Decision Diagnostics and
2  PharmaTech Solutions suffered $100,725 in net financial losses. As ▓▓▓ agreed to buy the
3  GenStrip at ▓▓▓ per unit, Decision Diagnostics and PharmaTech Solutions expected to make ▓▓▓
4  for each unit sold. However, as a direct result of Mr. Diskant's letter, ▓▓▓ refused to accept
5  shipment and to pay for ▓▓▓ units of the 24,000 units contemplated by the purchase order.
6  Therefore, Decision Diagnostics and PharmaTech Solutions lost net revenue from sales under the
7  purchase order was $100,725 ▓▓▓
8      11.  ▓▓▓
9      a.      ▓▓▓ agreed to purchase 24,000 units of GenStrip 50's at ▓▓▓
10 per unit. That agreement is reflected in a purchase order that was produced to Lifescan bearing the
11 notation HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY, a true and correct copy of
12 which is attached hereto as Exhibit "D." The purchase agreement reflects a total purchase price of
13 ▓▓▓
14     b.      After and because of receiving a threatening letter from Mr. Diskant, a true and
15 correct copy of which is attached hereto as Exhibit "E," ▓▓▓ cancelled the purchase
16 order and refused to take any further shipments in accordance with its terms.
17     c.      By the time ▓▓▓ cancelled the purchase order, ▓▓▓
18 had been shipped ▓▓▓ units. In subsequent negotiations, ▓▓▓ agreed to pay for the units it had
19 already received, but refused to accept any further units under the order and demanded I give them
20 ▓▓▓ additional units free of charge, which I have partially fulfilled and will complete in the next
21 month. As a result of Mr. Diskant letter to ▓▓▓, Decision Diagnostics and PharmaTech
22 Solutions suffered $166,242 in net financial losses. As ▓▓▓ agreed to buy the GenStrip at ▓▓▓
23 per unit, Decision Diagnostics and PharmaTech Solutions expected to make ▓▓▓ for each unit sold.
24 However, as a direct result of Mr. Diskant's letter, ▓▓▓ refused to accept shipment and to
25 pay for ▓▓▓ of the 24,000 units contemplated by the purchase order, and
26 also demanded to receive another ▓▓▓ units free of charge. Therefore, Decision Diagnostics and
27 PharmaTech Solutions lost net revenue from sales under the purchase order was $59,670 ▓▓▓
28

                                    5

1  ▮ and Decision Diagnostics and PharmaTech Solutions net loss for giving away ▮ units was
2  $106,572. ▮ also has purchased many different products from Pharma Tech in the past not
3  associated with their purchases of Genstrip. As a result of Mr. Diskant's letter, ▮ has withheld
4  payment on $45,000 of product unassociated with the Genstrip sales.
5      12. ▮
6      a. ▮ offered to purchase 46,000 units of GenStrip at ▮ per
7  unit. That agreement is reflected in a purchase order that was produced to Lifescan bearing the
8  notation HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY, a true and correct copy of
9  which is attached hereto as Exhibit "F." The purchase agreement reflects a total purchase price of
10 ▮
11     b. After and because of receiving a threatening letter from Mr. Diskant, ▮
12 ▮ cancelled the purchase order and refused to take any further shipments in accordance
13 with its terms. A true and correct copy of Mr. Diskant's letter to ▮ is attached
14 hereto as Exhibit "G."
15     c. As a result of Mr. Diskant letter to ▮ Decision Diagnostics
16 and PharmaTech Solutions suffered $177,100 in net financial losses. As ▮ agreed
17 to buy the GenStrip at ▮ per unit, Decision Diagnostics and PharmaTech Solutions expected to
18 make ▮ for each unit sold. However, as a direct result of Mr. Diskant's letter, ▮ refused to
19 accept shipment and to pay for any of units contemplated by the purchase order. Therefore, Decision
20 Diagnostics and PharmaTech Solutions lost net revenue from sales under the purchase order was
21 $177,100 ▮ .
22     I declare under the penalty of perjury under federal law that the following is true and correct,
23 and that I executed this Declaration at Westlake Village, California on September 25, 2013.

_Keith Berman_

6